## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JEREMY THOMASON, #M39074, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 22-cv-834-RJD |
| | ) | |
| DONNA LYNN ALLISON, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

**DALY, Magistrate Judge:**[1]

Plaintiff Jeremy Thomason, an inmate in the custody of the Illinois Department of Corrections ("IDOC"), filed this lawsuit pursuant to 42 U.S.C. § 1983, alleging he was provided inadequate medical treatment for an injury he sustained to the middle finger on his right hand while at Lawrence Correctional Center ("Lawrence"). After threshold review of the Amended Complaint, Plaintiff was allowed to proceed on the following claims:

Count 1:    Eighth Amendment claim against Allison, Stover, and Lackey for exhibiting deliberate indifference to Plaintiff's serious medical needs relating to his May 2, 2021, finger injury.

Count 2:    Eighth Amendment claim against Wexford for a policy or practice of failing to provide adequate, qualified medical staff that resulted in a denial of constitutionally adequate medical care for Plaintiff's May 2, 2021, finger injury.

Count 3:    State law claim against Allison, Stover, and Lackey for providing negligent medical care for Plaintiff's May 2, 2021, finger injury.

---

[1] This matter has been referred to the undersigned, through the parties' consent, to conduct all proceedings in this case, including trial and final entry of judgment pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. (Doc. 58).

Count 4:    State law claim against Wexford for the negligent medical care provided by its employees for Plaintiff's May 2, 2021, finger injury.

Count 5:    State law claim of intentional infliction of emotional distress against Allison, Lackey, and Stover related to their provision of medical treatment for Plaintiff's May 2, 2021, finger injury.

(*see* Docs. 59, 60). The Warden of Lawrence was also added as a defendant in this case to effectuate any ordered injunctive relief requested by Plaintiff.[2] (Docs. 12 & 59). Thereafter, Plaintiff's deliberate indifference claim (Count 1) against Defendant Lackey was dismissed on a motion for summary judgment for failure to exhaust administrative remedies. (Doc. 86).

This matter is now before the Court on Defendants Allison, Stover, Lackey, and Wexford's Motion for Summary Judgment (Doc. 99). Plaintiff filed a response (Doc. 116), and Defendants replied (Doc. 117). Also before the Court is the Warden of Lawrence's Motion to Dismiss for Lack of Jurisdiction (Doc. 110), to which Plaintiff did not file a response. For the reasons set forth below, Defendants Allison, Stover, Lackey, and Wexford's Motion for Summary Judgment (Doc. 99) is **GRANTED in part and DENIED in part,** and the Warden of Lawrence's Motion to Dismiss for Lack of Jurisdiction (Doc. 110) is **GRANTED**.

**Defendants Allison, Stover, Lackey, and Wexford's Motion for Summary Judgment (Doc. 99)**

### Material Facts

At all relevant times, Plaintiff was incarcerated within the IDOC at Lawrence. (Doc. 99, ¶1; Doc. 116, p. 1). During all relevant times, Defendant Wexford Health Sources, Inc. ("Wexford") employed Defendant Sara Stover ("NP Stover") as a nurse practitioner, Defendant

---

[2] Pursuant to Federal Rule of Civil Procedure 25(d), the Acting Warden of Lawrence Correctional Center, Jeremiah Brown, was substituted for Dee Dee Brookhart. Fed. R. Civ. P. 25(d).

Donna Allison ("Nurse Allison") as a nurse, and Defendant Ashley Lackey ("Director of Nursing Lackey") as the Director of Nursing at Lawrence.  (Doc. 12 at 2; Doc. 99, ¶¶2-4; Doc. 116, p. 2).

On May 2 or May 3, 2021, Nurse Allison saw Plaintiff for a complaint of a fractured finger. (Doc. 99, ¶5; Doc. 99-1, p. 1, 132-133; Doc. 116, pp. 2-3).[3]  Plaintiff reported that he had fractured his right middle finger the previous day playing basketball in the yard, which caused restriction in his range of motion and "8/10" pain.  (Doc. 99, ¶5; Doc. 99-1, p. 1).  Upon examination, Nurse Allison observed slight swelling and bruising    (*Id.*).    She provided Plaintiff a splint and acetaminophen and instructed him to follow up if symptoms worsened.  (*Id.*).  Plaintiff attested that, at that time, his finger was crooked and discolored.  (Doc. 116, p. 4).  He further attested that Nurse Allison stated that his finger "looked pretty messed up," but there was "nothing much that she [could] do," to which Plaintiff responded that he did not want his finger to be permanently crooked.  (*Id.*).  Plaintiff requested an ice permit for the swelling, to which Nurse Allison allegedly responded that "she could not give out."  (*Id.*).

On May 3, 2021, an LPN entered a note stating that Plaintiff's finger was swollen and turning black from bruising.  (Doc. 99, ¶6; Doc. 99-1, p. 2; Doc. 116, p. 5).  She indicated that he would be put on the schedule to see the nurse practitioner.  (*Id.*).  On May 4, 2021, Plaintiff saw NP Stover; he reported injuring his finger while playing basketball and complained that his finger hurt, but he had not had an x-ray or gone to the emergency room.  (Doc. 99, ¶7; Doc. 99-1, p. 3). Upon examination, Stover noted Plaintiff's third digit on the right hand was splinted, and observed Plaintiff had decreased range of motion in the first knuckle with no range of motion in the two

---

[3] Defendants allege that Nurse Allison first saw Plaintiff on May 2, 2021, while Plaintiff argues that he saw her on May 3, 2021.  (Doc. 99 ¶5; Doc. 116, pp. 2-3).  This dispute, however, is immaterial because the record on which Nurse Allison relies reflects that Plaintiff was injured on May 1, 2021, while Plaintiff argues that he was injured on May 2, 2021.  Accordingly, under either version of the events, Plaintiff did not see any medical staff until the day after his injury.  (Doc. 99-1, p. 1, 132-133).

distal knuckles. (*Id.*). She noted Plaintiff's most distal knuckle was bent with swelling/bruising. (*Id.*). NP Stover straightened Plaintiff's distal knuckle and placed a splint made of tongue suppressors cut in half, gauze, and tape. (Doc. 99, ¶7; Doc. 99-1, p. 3; Doc. 117, pp. 1-2). NP Stover charted that no x-ray was necessary and assessed Plaintiff's right third digit as fractured. (*Id.*). NP Stover planned a follow-up appointment on May 7 for a splint change and to manually straighten the finger. (*Id.*). She switched Plaintiff's Indomethacin medication from DOT (direct observation treatment) to KOP (keep on person). (*Id.*). NP Stover ordered a permit for ice three extra times a day and instructed him to place his hand in a bag for showers for one month. (*Id.*).

NP Stover saw Plaintiff again on May 7, 2021, to follow up on his finger injury. (Doc. 99, ¶8; Doc. 99-1, p. 4). Plaintiff reported his third digit remained swollen and bruised and complained of a lot of pain when the splint was on, but stated he wanted to continue to try and straighten it out. (*Id.*). NP Stover removed and replaced Plaintiff's splint and gave him 1000 mg Tylenol and 800 mg Ibuprofen while at the office. (*Id.*). She assessed Plaintiff as having a finger fracture/injury and ordered an x-ray. (*Id.*). NP Stover gave Plaintiff 60 tabs of Tylenol 500 mg and 60 tabs of 800 mg Ibuprofen and planned a follow-up visit. (*Id.*). However, according to Plaintiff, he was only provided with a single dose of 800 mg of Ibuprofen and never received NP Stover's prescription. (Doc. 116, p. 5). Plaintiff underwent an x-ray on May 7, 2021, which was interpreted as showing a small intraarticular fracture of the dorsal base of the distal phalanx with mild soft tissue swelling, and indicated the fracture may be acute to subacute in nature. (Doc. 99, ¶9; Doc. 99-1, pp. 4, 124; Doc. 116, p. 5).

NP Stover saw Plaintiff again on May 10, 2021. (Doc. 99, ¶10; Doc. 99-1, p. 5; Doc. 116, p. 5). Plaintiff continued to complain of pain in his right third digit and said he was taking Ibuprofen and Tylenol, but not taking Ibuprofen with Indomethacin, and reported using ice on his

finger as previously ordered.  (*Id.*).  NP Stover observed Plaintiff's finger was still swollen and assessed him as having a finger fracture/injury.  (*Id.*).  She removed and replaced Plaintiff's splint and planned to continue the plan of care with a follow-up visit planned for May 13, 2021.  (*Id.*).  Plaintiff counters that he was not prescribed 800mg Ibuprofen for in-person use because NP Stover advised him that Ibuprofen was not to be used with Indomethacin medication.  (Doc. 116, p. 5).  In support of his allegation, Plaintiff cites medical notes dated May 20, 2021.  (Doc. 116, p. 5; Doc. 99-1, p. 20).

On May 20, 2021, NP Stover noted that she renewed Plaintiff's current medications for 12 months, including Indomethacin, Colace, and Excedrin Migraine, which medications Plaintiff counters were unrelated to his finger injury.  (Doc. 99, ¶11; Doc. 99-1, p. 6; Doc. 116, p. 5).  NP Stover saw Plaintiff again on May 24, 2021, to change Plaintiff's finger splint and follow up on the recent x-ray of his finger (Doc. 99, ¶12; Doc. 99-1, p. 7; Doc. 116, p. 6).  She noted the x-ray showed a small intraarticular fracture of the dorsal base of the distal phalanx with mild soft tissue swelling.  (*Id.*).  NP Stover assessed Plaintiff as having a finger fracture, changed his finger splint, ordered Indomethacin 25 mg for 12 months, which Plaintiff argues was for his back pain injury and not for his finger, and planned a follow-up visit.  (*Id.*).

Plaintiff saw NP Stover on May 28, 2021, to change his finger splint.  (Doc. 99, ¶13; Doc. 99-1, p. 8; Doc. 116, p. 6).  He reported increased finger pain the prior night, so NP Stover applied support to only the bottom of the finger to decrease pain.  (*Id.*).  NP Stover assessed Plaintiff as having a finger fracture, ordered a repeat x-ray of the finger, and planned a follow-up visit to change his splint.  (*Id.*).  Thereafter, NP Stover saw Plaintiff on June 2, 2021, to follow up on recent x-rays and to change his finger splint.  (Doc. 99, ¶14; Doc. 99-1, p. 9; Doc. 116, p. 6).  Plaintiff self-reported increased pain in his right third finger during rain and storms.  (*Id.*).  NP

Stover reviewed his x-ray results with him and discussed that the x-ray showed a small intra-articular fracture of the dorsal base of the distal phalanx with mild soft tissue swelling. (*Id.*). Upon examination, Stover observed swelling at the distal end of the right third digit. (*Id.*). She replaced Plaintiff's splint and wrapped gauze around the support to prevent further skin irritation. (*Id.*). NP Stover assessed Plaintiff as having a finger fracture, noted she had already ordered a one-month repeat x-ray on May 28, and planned follow-up visits to treat his finger. (*Id.*).

On June 7, 2021, Plaintiff saw NP Stover for follow-up treatment for his finger. (Doc. 99, ¶15; Doc. 99-1, p. 10; Doc. 116, p. 6). Plaintiff self-reported that sometimes his finger hurts worse than other times and that his skin felt raw when the splint was off. (*Id.*). NP Stover changed Plaintiff's splint and observed swelling/bruising on examination. (*Id.*). She planned to continue the current plan of care and advised Plaintiff she would see him for follow-up treatment. (*Id.*). An x-ray report taken on June 16 indicated a mild displacement avulsion fracture of the distal phalanx of the right third finger, with no significant change in appearance since the prior study on May 7, 2021. (Doc. 99, ¶16; Doc. 99-1, p. 125; Doc. 116, p. 6).

On June 25, 2021, Plaintiff saw NP Stover, who reviewed the results of the recent x-ray. (Doc. 99, ¶17; Doc. 99-1, p. 13; Doc. 116, pp. 6-7). Plaintiff complained of only getting 25 mg of Indomethacin at a time instead of 50 mg. (*Id.*). NP Stover observed that Plaintiff's finger was still crooked at the distal knuckle. (*Id.*). She changed Plaintiff's finger splint, clarified her medication order to state Plaintiff should receive 50 mg of Indomethacin (two 25 mg tabs), ordered a repeat x-ray of the finger, and planned a follow-up visit to change Plaintiff's finger splint. (*Id.*). Plaintiff expressed again his frustration that the x-ray showed no healing despite the six weeks of treatment, and asked NP Stover why she had not done more to address his injury, to which she responded: "It's just a crooked finger, is not the end of the world," and continued the same treatment. (*Id.*).

NP Stover saw Plaintiff for the last time on June 30, 2021; she changed Plaintiff's splint, renewed his permit for ice three extra times daily, and directed him to place his hand in a bag for showers for one month. (Doc. 99, ¶18; Doc. 99-1, p. 14; Doc. 116, p. 7).

Plaintiff visited the nurse sick call on July 27, 2021, for a splint change; the nurse noted that Dr. Babich added Plaintiff to the lab line for splint changes every three days and extended his permits for extra ice and a shower bag for 30 days. (Doc. 99, ¶19; Doc. 99-1, p. 16; Doc. 116, p. 7). Plaintiff received splint changes every three days through the rest of July and early August 2021. (Doc. 99, ¶20; Doc. 99-1, pp. 17-18; Doc. 116, p. 8).

On August 7, 2021, Plaintiff saw Dr. Percy Myers for his fractured finger and complained that an X-ray showed no healing and that his finger was curved. (Doc. 99, ¶21; Doc. 99-1, pp. 17-19; Doc. 116, p. 8). Dr. Myers noted that comparison of x-rays from May to June showed no healing, so he planned a follow-up x-ray of the right hand and a possible referral to an orthopedic consultation, depending on the result of the planned X-ray. (*Id.*). An x-ray taken on August 10 revealed that the previously seen fracture line at the dorsal base of the third distal phalanx was less conspicuous, indicating interval healing, with no new fracture identified and normal alignment preserved. (Doc. 99, ¶22; Doc. 99-1, p. 126; Doc. 116, p. 8). The radiologist's impression was healing/healed fracture of the third distal phalanx. (*Id.*).

On September 7, 2021, Plaintiff saw Dr. Yoko Savino, who found that Plaintiff's right third distal finger was tilted toward the index finger, and that Plaintiff could not actively or passively flex the PIP or DIP joints. (Doc. 99, ¶23; Doc. 99-1, p. 21; Doc. 116, p. 9). She planned to write a referral for an MRI to assess soft tissue status in Plaintiff's finger, consider a referral to orthopedics after the MRI, and place a new splint on the injured finger. (*Id.*). Plaintiff further attested that Dr. Savino suggested Plaintiff's finger should have been in a "real splint" from the

beginning.  (Doc. 116, p. 9).  However, Defendants denied Plaintiff's allegation, pointing out that it was unsupported by the cited note summary.  (Doc. 116, p. 9: Doc. 99-1, p. 21).  On October 5, 2021, Dr. Savino saw Plaintiff again and noted that his finger was in a splint, that she had a long discussion with him about avoiding opioid pain medication for this type of chronic pain, and that Plaintiff reluctantly voiced understanding.  (Doc. 99, ¶24; Doc. 99-1, p. 24; Doc. 116, p. 9).  Dr. Savino explained that Plaintiff would not need further pain medication because he would undergo an MRI and possible surgery in the future, if indicated.  (*Id.*).

An MRI conducted on November 10, 2021, indicated abnormal edema deep to the third flexor tendon at the level of the middle phalanx with some mild edema in the region, raising concern for an A4 pulley injury.  (Doc. 99, ¶25; Doc. 99-1, p. 131; Doc. 116, p. 9).  The MRI report also noted a possible remote injury of the DIP joint, but explained the injury was difficult to delineate given the resolution and slice thickness.  (*Id.*).  That same day, Plaintiff saw Dr. Savino and complained of intermittent numbing pain in his right third finger and side effects of medication.  (Doc. 99, ¶26; Doc. 99-1, p. 29; Doc. 116, p. 10).  Dr. Savino noted that Plaintiff had a "mallet finger," that Plaintiff's finger remained in a splint, and that Plaintiff could flex his DIP joint.  (*Id.*).  She discontinued Naproxen and ordered Tylenol 500 mg and Pamelor 25 mg, and discussed opioid dependency/addiction.  (*Id.*).  She wrote that she would consider a referral to orthopedics after reviewing Plaintiff's MRI results.  (*Id.*).  Dr. Savino saw Plaintiff again on November 16, 2021; she reviewed Plaintiff's MRI results and noted the MRI report suggested an A4 pulley injury.  (Doc. 99, ¶27; Doc. 99-1, p. 38; Doc. 116, p. 10).  She found Plaintiff's right third finger was fairly stuck in extension and that Plaintiff could not completely flex the DIP and PIP joints.  (*Id.*).  A referral for hand surgery was done that day.  (*Id.*).

Plaintiff saw Dr. Savino again on December 23, 2021, and complained that pain medication was not helping.  (Doc. 99, ¶29; Doc. 99-1, p. 34; Doc. 116, p. 10).  Dr. Savino noted Plaintiff was awaiting a visit with a hand surgeon and ordered Tramadol 50 mg taken at night for 60 days.  (*Id.*).  Plaintiff visited nurse sick call on January 10, 2022, and requested more pain medication.  (Doc. 99, ¶30; Doc. 99-1, p. 34; Doc. 116, p. 10).

On February 16, 2022, Plaintiff saw a nurse practitioner for a renewal and increase of his pain medication for his finger pain.  (Doc. 99, ¶31; Doc. 99-1, pp. 43-44; Doc. 116, p. 10).  The nurse practitioner contacted Dr. Myers, who reviewed Plaintiff's current medications and x-ray and MRI imaging, and indicated he was not pleased with Plaintiff's lengthy narcotics usage for an injury that occurred last May/June of 2021.  (*Id.*).  Dr. Myers adjusted his medication.  (*Id.*).

Plaintiff saw Dr. Jonas Reid at the Hand Surgery Clinic at Carle Physician Group on March 14, 2022, to evaluate persistent pain in his finger.  (Doc. 99, ¶34; Doc. 99-1, pp. 66-67; Doc. 116, p. 10).  He reported continuing soreness around his right middle finger DIP joint and said the finger was stiff and he could not fully flex it into his palm.  (*Id.*).  Upon examination, Dr. Reid found a very mild angular deformity to the right middle DIP finger joint, and that Plaintiff was able to fully actively extend his middle finger with a mild, roughly 15-degree DIP extensor lag, though he could extend against resistance.  (*Id.*).  He reviewed Plaintiff's x-rays and MRI of the right middle finger and noted some arthrosis of the DIP joint with the deformity to the dorsal base of the distal phalanx suggestive of a possible healed prior fracture.  (*Id.*).

At the March 14, 2022, surgery clinic visit, Dr. Reid advised Plaintiff that any acute fractures or injuries had healed by that point.  (Doc. 99, ¶34; Doc. 99-1, p. 67; Doc. 116, p. 10).  Dr. Reid further discussed the suspected A4 pulley injury on the MRI report, noting that it was not an area where Plaintiff was having pain and did not think there was an issue with his flexor tendons.

(Doc. 99, ¶34; Doc. 99-1, p. 67; Doc. 116, p. 10).  Dr. Reid opined that Plaintiff had residual stiffness, likely due to prolonged splinting.  (*Id.*).  He did not recommend anything beyond symptomatic treatment and hand therapy to regain range of motion and demonstrated physical therapy exercises for Plaintiff to do on his own.  (*Id.*).  He further observed Plaintiff did not have a significant lag to his right DIP joint, though he did have mild deformity and may be developing early arthrosis.  (*Id.*).  He noted that no further follow-up with him was needed.  (*Id.*).

On March 18, 2022, during a follow-up visit with a nurse practitioner for his medical furlough to the hand surgery clinic, Plaintiff expressed dissatisfaction with the hand specialist's recommendations and requested a second opinion.  (Doc. 99, ¶35; Doc. 99-1, p. 45; Doc. 116, p. 10).  The nurse practitioner ordered Indomethacin 50 mg for 6 months and planned a possible referral to an orthopedic specialist or hand surgeon for a second opinion.  (*Id.*).

Plaintiff participated in physical therapy in April and May 2022.  (Doc. 99, ¶36-38; Doc. 99-1, pp. 46-47, 51-59; Doc. 116, p. 11).  He reported tingling pain in his right third digit and difficulty gripping and grabbing with his right hand.  (Doc. 99, ¶36; Doc. 99-1, pp. 46-47; Doc. 116, p. 11).  The physical therapist found Plaintiff's right finger was tender to palpation at the DIP joint, and range of motion in his hand was within normal limits except for the third DIP flexion.  (*Id.*).  He assessed Plaintiff as having good rehab potential and planned to continue sessions to increase range of motion in Plaintiff's finger.  (*Id.*).

On May 24, 2022, the physical therapist observed that Plaintiff had normal range of motion in his right third finger and had achieved all treatment goals except pain management.  (Doc. 99, ¶39; Doc. 99-1, p. 63; Doc. 99-2, pp. 48-49;  Doc. 116, p. 11).  The physical therapist discontinued skilled physical therapy and encouraged Plaintiff to continue his home exercise program on his own.  (Doc. 99, ¶39; Doc. 99-1, p. 63; Doc. 116, p. 11).

While not included in the medical record, Plaintiff testified at his deposition that after completing his physical therapy, he was also assessed by a second orthopedic surgeon. (Doc. 99-2, pp. 44-45). Plaintiff testified that the second orthopedic surgeon did not recommend hand surgery because it would eliminate the range of motion in his finger. (Doc. 99-2, pp. 44-45). According to Plaintiff, the surgeon told him that if he had "been taken care of properly at an early stage, that we wouldn't have been where we were." (*Id.* at 54). Further, the surgeon recommended occupational therapy, which was not offered at Lawrence. (*Id.*). Plaintiff was sent to an outside provider, who assessed him for occupational therapy twice a week, but Plaintiff never received this treatment. (*Id.*). He is currently using a handball to improve his grip and range of motion. (*Id.*). Plaintiff still cannot make a full closed fist. (Doc. 99-2, p. 57). He alleges that his injury affects his daily activities, such as working out and exercising, because of the failure to properly grip the weights. (*Id.* at 52). He believes that after being released from prison, his injury will affect his future employment, since he has only construction work experience. (*Id.*). Plaintiff further attested that any medication that he was prescribed regarding his finger injury only "eased" but never completely relieved his pain. (Doc. 116, p. 12).

At his deposition, Plaintiff could not identify a specific policy or procedure of Wexford's that he believed negatively impacted his medical care. (Doc. 99, ¶45; Doc. 99-2, p. 57; Doc. 116, p. 11). However, in his response, Plaintiff pointed to the policies and procedures he allegedly identified in his Amended Complaint. (Doc. 116, p. 13).

## Summary Judgment Standard

Summary judgment is appropriate only if the moving party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322(1986); *see also Ruffin-*

*Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005).  The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact. *Celotex*, 477 U.S. at 323.  Once a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at 248).  In considering a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

## Discussion

### Count 1

The Eighth Amendment "'does not mandate comfortable prisons,' but neither does it permit inhumane ones." *Brown v. Osmundson*, 38 F.4th 545, 559-60 (7th Cir. 2022) (internal citations omitted).  To succeed on his deliberate indifference claims, Plaintiff must "provide evidence, either direct or circumstantial," establishing that "he had an objectively serious medical need," which the defendants knew of but disregarded. *Id.* at 550.  Negligence or even recklessness does not constitute deliberate indifference; the defendant must have shown "something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Id.*

The Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).  Further, "[d]isagreement between a prisoner and his doctor, or even between two medical professionals,

about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.* Deliberate indifference implies a defendant's medical judgment was "so far afield of accepted professional standards as to raise the inference that it was not actually based on medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 395, 396 (7th Cir. 2006); *Plummer v. Wexford Health Sources, Inc.*, 609 Fed. Appx. 861, 2015 WL 4461297, *2 (7th Cir. 2015) (holding that defendant doctors were not deliberately indifferent because there was "no evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments").

At the same time, "receipt of some medical care does not automatically defeat a claim of deliberate indifference" and "persist[ance] in a course of treatment known to be ineffective . . . may support an inference that a medical official recklessly ignored an inmate's serious medical condition." *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007); *Machicote v. Roethlisberger*, 969 F.3d 822, 828 (7th Cir. 2020) (citation omitted). "Deliberate indifference may occur where a prison official, having knowledge of a significant risk to inmate health or safety, administers 'blatantly inappropriate' medical treatment, acts in a manner contrary to the recommendation of specialists, or delays a prisoner's treatment for non-medical reasons, thereby exacerbating his pain and suffering." *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (internal citation omitted).

Here, there is sufficient evidence on the record to infer that Plaintiff suffered a serious medical need, in the form of a fractured finger, pain, and loss of range of motion, which precludes summary judgment on that ground. *See Conley v. Birch*, 796 F.3d 742, 747 (7th Cir. 2015) (medical notes reporting severe swelling, loss of function and mobility extending four fingers, hand discoloration, and possible or probable fracture suggested a serious medical need); *Edwards*, 478 F.3d at 830 (allegations for openly dislocated finger sufficed to state a serious medical need).

The Court will examine the deliberate indifference element of Plaintiff's claim as to each of the Defendants.

**Nurse Allison**

Regarding Nurse Allison, nothing in the record suggests that she was deliberately indifferent to Plaintiff's serious medical need in violation of the Eighth Amendment. Plaintiff's only encounter with Nurse Allison was on the day after his finger injury. Upon examination, Nurse Allison observed slight swelling and bruising. She provided Plaintiff a splint and acetaminophen and instructed him to follow up if symptoms worsened. Plaintiff complains that Allison was deliberately indifferent because she failed to order x-rays prior to splinting his finger. (Doc. 99-2, p. 54). However, there is no evidence that Allison, being a nurse, had authority to order x-rays. Even if she did have authority, Plaintiff had x-rays a few days later, on May 7, 2021. When the issue is a delay in the medical assistance rather than its denial, the plaintiff must "offer verifying medical evidence that the delay (rather than the inmate's underlying condition) caused some degree of harm." *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013) (citation and internal quotation marks omitted). Here, Plaintiff has not offered any evidence that a 4-5-day delay for the x-ray caused any harm, given that Allison proceeded with splinting Plaintiff's finger and providing medication for his pain. There is no indication that Plaintiff would have received different treatment for his fractured finger had he undergone an x-ray, which is a diagnostic tool, the day he saw Nurse Allison. *See Pyles*, 771 F.3d at 411 ("the decision to forego diagnostic tests is a classic example of a matter for medical judgment." (citation and internal quotation marks omitted). Likewise, there is no evidence that the denial of an ice permit for the swelling caused Plaintiff any injury, given that Plaintiff was prescribed acetaminophen, and he received the ice permit the following day from NP Stover.

Plaintiff further complains about the use of the hand-made splint, as opposed to a plastic one. However, there is nothing in the record suggesting that another type of splint would be medically necessary the day after Plaintiff's injury or that Nurse Allison was aware of such a need at that time. While Plaintiff attested that Dr. Savino told him that his finger should have been in a "real splint" from the beginning, disagreement in medical judgment does not amount to deliberate indifference. *Pyles*, 771 F.3d at 409 ("[d]isagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation.").

Further, Nurse Allison's alleged statements during this visit regarding Plaintiff's finger looking "pretty messed up," and that there was "nothing much" that she could do, even viewed in the light most favorable to Plaintiff, are insufficient to establish Allison's deliberate indifference in light of her undisputed provision of medical care for Plaintiff. (*Id.*). In sum, there is nothing in the record suggesting that Nurse Allison, in her brief encounter with Plaintiff, exhibited conduct "approaching a total unconcern" or that her response "was so plainly inappropriate as to permit the inference that [she] intentionally or recklessly disregarded his needs." *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008) (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)). Accordingly, Nurse Allison is entitled to summary judgment as a matter of law on Count 1.

**NP Stover**

Regarding NP Stover, this is not a case in which the plaintiff has been denied medical care. Rather, it is unquestionable that NP Stover treated Plaintiff on a regular basis for his finger injury for approximately two months. NP Stover saw Plaintiff approximately eight times between May 4, 2021, and June 30, 2021. On May 4, 2021, NP Stover saw Plaintiff and observed swelling and bruising to his right third finger, for which she replaced his splint, issued a permit for additional

ice, and assessed the injury as a fractured finger. She thereafter regularly saw Plaintiff to assess the injury, order x-rays, change his finger splint, and order additional or different pain medications from May through June 2021 to address Plaintiff's ongoing complaints of pain. She monitored the progress of healing in Plaintiff's finger and provided treatment designed to minimize pain during the healing process. During her last encounters with Plaintiff, she noted x-rays from May 7, 2021, and June 16, 2021, showed no significant changes and planned a repeat x-ray to further assess the course of healing. Based on the foregoing course of treatment, no reasonable jury could infer that NP Stover denied Plaintiff medical treatment, especially regarding Plaintiff's complaints about pain.

Plaintiff argues, however, that NP Stover was deliberately indifferent in that she persisted for over six weeks in the same course of treatment, including the use of handmade splints instead of a "real splint," even though Plaintiff's finger was remaining crooked, was not healing, and had a limited range of motion. (Doc. 116, p. 9).[4] He relies on the fact that NP Stover and Dr. Myers had allegedly advised him that this type of injury typically heals in about six to eight weeks.

Contrary to Plaintiff's assertion, in general, the record does not show that NP Stover merely persisted in the same treatment during the two months she treated Plaintiff. Every time she saw Plaintiff, she tried a splint, adjusted or altered Plaintiff's pain medication to alleviate the level of his pain, or ordered x-rays. NP Stover's alleged persistence in the use of a handmade splint, however, is a closer call. When a plaintiff claims that medical providers delayed rather than denied medical assistance to an inmate, the plaintiff must "offer verifying medical evidence that the delay

---

[4] Plaintiff refers to the "handmade splint" as the one made of tongue suppressors cut in half, gauze, and tape. He contrasts this with the "real splint," which Dr. Savino provided Plaintiff approximately four months following his injury and which was made from plastic. (Doc. 99, ¶7; Doc. 99-1, p. 3; Doc. 117, pp. 1-2).

(rather than the inmate's underlying condition) caused some degree of harm." *Jackson,* 733 F.3d at 790 (citation and internal quotation marks omitted). The Seventh Circuit has clarified that expert testimony is not the sole form of acceptable verifying medical evidence to establish a delay or mistreatment in this context. *Grieveson v. Anderson*, 538 F.3d 763, 779–80 (7th Cir. 2008). Nevertheless, evidence of a plaintiff's diagnosis and treatment, standing alone, is insufficient to make such a showing "*if it does not assist the jury in determining whether a delay exacerbated the plaintiff's condition or otherwise harmed him.*" *Id.* (quoting *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007) (emphasis in the original)).

Here, Plaintiff attested that Dr. Savino told him that his finger should have been in a "real splint" from the beginning. (Doc. 116, p. 9). Unlike Nurse Allison, who only observed Plaintiff's injury for one day, NP Stover treated Plaintiff for over two months. During that time, the clinical examination showed that Plaintiff's finger remained crooked and had a limited range of motion; the x-rays confirmed that it was not healing, and Plaintiff continued to report significant pain. Further, Dr. Reid's assessment shows that Plaintiff had residual stiffness likely due to prolonged splinting.[5] This verifying medical record is sufficient to create a question of fact as to whether NP Stover's persistence in the use of a hand-made splint and failure to examine other alternatives exacerbated Plaintiff's injury. Also indicative of NP Stover's potential deliberate indifference to Plaintiff's injury was her response to Plaintiff on June 25, 2025, when he expressed again his frustration to NP Stover that the x-ray showed no healing and asked her why she had not done more to address his injury to which NP Stover responded: "It's just a crooked finger, is not the

---

[5] Plaintiff further testified that the second surgeon told him that if he had "been taken care of properly at an early stage, that we wouldn't have been where we were." (Doc. 99-2, p. 54). However, neither party attached the relevant medical records to their briefs. Accordingly, the Court cannot take this statement into consideration in ruling on the motion for summary judgment. *See, e.g., Boyce v. Moore,* 314 F.3d 884, 889–90 (7th Cir.2002).

end of the world." Based on the record, the Court cannot say that no reasonable jury could infer that NP Stover was deliberately indifferent to Plaintiff's serious medical need. Accordingly, Defendants' motion for summary judgment is denied with respect to NP Stover.

### Count 2

Plaintiff raises an Eighth Amendment deliberate indifference claim against Wexford for its alleged failure to provide adequate, qualified medical staff to exercise sound judgment regarding his medical care. (Doc. 60, ¶29). Plaintiff argues that Wexford has a policy or practice of allowing nurses and nurse practitioners to treat inmates beyond their level of skill, knowledge, and training. In order for Plaintiff to recover on his policy claim against Defendant Wexford, he must offer evidence that his injury was caused by a policy, custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy, that was implemented by Wexford. *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 796 (7th Cir. 2014). Plaintiff must also show that Wexford was aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect him. *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2009). Finally, the policy or practice "must be the 'direct cause' or 'moving force' behind the constitutional violation." *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (internal citations omitted). Further, because *respondeat superior* liability is inapplicable in this context, Wexford cannot be liable for an Eighth Amendment violation caused by one of its employees based solely on the employment relationship. *See Shields*, 746 F.3d at 789. The critical question is whether "the action about which the plaintiff is complaining [is] one of the institution itself, or is it merely one undertaken by a subordinate actor." *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017) (en banc).

Here, nothing in the record supports an inference that Wexford had a policy or practice to allow nurses and nurse practitioners to treat inmates beyond their level of skill, knowledge, and training.  During his deposition, Plaintiff stated that he considered Wexford liable "because [it] actually employed these people that lacked the knowledge to actually take care of someone." (Doc. 99-2, pp. 56-57).  However, this describes *respondeat superior* liability, which is not recognized under §1983.  When asked regarding any specific policies or practices, Plaintiff responded that he was unsure, but his "friend Corky Terry" explained to him "something along the lines of Wexford having certain policies about the kind of care that their workers are supposed to provide." (*Id.*). In his response to the motion, Plaintiff acknowledged that he did not identify any Wexford practice or policy during his deposition, but he pointed to his Amended Complaint.  The Amended Complaint, however, only includes conclusory statements about Wexford's alleged failure to provide adequate, qualified medical staff to exercise sound judgment on his medical care.  (Doc. 60, ¶29).

The evidence before the Court is more indicative of isolated wrongdoing by individual defendants as opposed to a widespread and pervasive problem resulting from Wexford's policy or practice.  Notably, Plaintiff stated in his deposition that both NP Stover and Nurse Allison were later fired by Wexford due to their alleged professional inadequacy. (Doc. 99-2, pp. 55-56).  This directly contradicts Plaintiff's argument that NP Stover and Nurse Allison's alleged failure to adequately treat Plaintiff's finger injury was the result of Wexford's policy or practice to allow nurses and nurse practitioners to treat patients beyond their level of expertise.  Further, Plaintiff does not provide any examples beyond his own to support his claims against Wexford. *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 655-56 (7th Cir. 2021) ("practice or custom theory will be more persuasive if a plaintiff can show that the defendant government or company treated

Page **19** of 25

other, similarly situated patients in similar unconstitutional ways"). Accordingly, the Court concludes that Plaintiff cannot prevail on his *Monell* claim against Wexford because the record is devoid of evidence that would support any causal link between the alleged policies and his own experience, or that the issue was so widespread or so serious that his personal experience suffices to establish a claim. Therefore, Wexford is entitled to summary judgment as to Count 2.

***Counts 3 & 4***

Plaintiff brings Illinois State Law Claims for medical negligence against Defendants Allison, Stover, and Lackey in Count 3 and Wexford in Count 4, alleging negligent medical care for his May 2, 2021, finger injury. Plaintiff was required to provide an affidavit or report pursuant to 735 ILCS §5/2-622, stating that there is a "reasonable and meritorious cause" for pursuing his claim against Defendants. *Hahn v. Walsh*, 762 F.3d 617, (7th Cir. 2014); *Young v. United States*, 942 F.3d 349, 351-52 (7th Cir. 2019). Summary judgment is the appropriate vehicle for the disposition of federally-filed Illinois state law claims lacking the requisite affidavit. *Young v. United States*, 942 F.3d 349, 351 (7th Cir. 2019) ("Illinois wants insubstantial medical-malpractice suits resolved swiftly. That goal can be achieved in federal court under summary-judgment practice…"). The written report must be by a physician licensed to practice medicine in all its branches. *Id.* In the alternative, a plaintiff may file an affidavit stating they were unable to complete the required consultation because the statute of limitations would impair the filing of the complaint or because they requested but have not received certain records. *Id.* at (2), (3). An affidavit is required as to each proposed defendant. *Id.* at (b). The failure to include this affidavit is grounds for dismissal. *Id.* at (g).

Plaintiff failed to provide an affidavit or report pursuant to 735 ILCS §5/2-622, stating that there is a "reasonable and meritorious cause" for pursuing his claim against Defendants, despite

this case pending for nearly three years.  Plaintiff responded that he complied with 735 ILCS §5/2-622 by attaching to the Amended Complaint his affidavit attesting that he has "reasonable and meritorious cause" for pursuing his state law negligence claim.  (Doc. 60, pp. 37-39).  In his affidavits, Plaintiff references two "Offender Outpatient Progress Notes" reported by Defendants Stover and Myers, which are also attached to the Amended Complaint as Exhibit C.  (Doc. 60, pp. 37-39, 73-75).  However, Defendant Stover's and Myers' progress notes are not affidavits and do not satisfy the requirements of 735 ILCS §5/2-622 since they do not express an opinion as to whether Plaintiff's state law negligence claim against them is reasonable and meritorious.  Likewise, Plaintiff's own affidavit does not satisfy the requirements of 735 ILCS §5/2-622 since it is not provided by a physician; nor does Plaintiff attest that he was unable to complete the required consultation, because the statute of limitations would impair the filing of the complaint, or because he requested but has not received certain records.  Accordingly, Defendants Allison, Stover, Lackey, and Wexford are also entitled to summary judgment on Counts 3 and 4.

*Count 5*

Plaintiff also brings intentional infliction of emotional distress claims against Nurse Allison, NP Stover, and Director of Nursing Lackey.  To prevail on a state law claim of intentional infliction of emotional distress, Plaintiff must establish that the Defendants' conduct was "extreme and outrageous," that Defendants knew their conduct would inflict on Plaintiff severe emotional distress, and that their conduct did in fact cause such levels of distress.  *Dixon v. Cnty. of Cook*, 819 F.3d 343, 351 (7th Cir. 2016).  A conduct is "extreme and outrageous" when "it goes beyond all possible bounds of decency" and is "intolerable in a civilized community."  *Id*.  However, not every conduct that satisfies the Eighth Amendment deliberate indifference standard will be so "extreme and outrageous" as to amount to intentional infliction of emotional distress.  *Id*.

Regarding Nurse Allison, there is nothing in the record to support a finding that her conduct was so "severe and outrageous" and that she knew that her conduct would inflict severe emotional distress. As set forth above, Allison's sole encounter with Plaintiff was on the day after his injury, at which time she provided Plaintiff a splint and acetaminophen and instructed him to follow up if symptoms worsened. (*Id.*). Even assuming that Allison's course of treatment was inadequate, there is nothing in the record suggesting that at that time, Allison was aware of that inadequacy and still persisted with denying Plaintiff further or alternative treatment, knowing that she would inflict severe emotional distress. In fact, Plaintiff's own deposition testimony that Allison "just didn't know what she was doing" and that she was fired for that reason, suggested at most, that Allison was grossly negligent in the treatment provided to Plaintiff. (*See* Doc. 99-2, pp. 58-59). Accordingly, Nurse Allison is entitled to summary judgment as a matter of law as to Count 5.

Turning to NP Stover, while the Court finds there is a factual dispute as to whether NP Stover was "deliberately indifferent," the threshold for showing an IIED claim is higher. It is undisputed that NP Stover did not deny Plaintiff treatment: she treated Plaintiff's finger injury at least eight times within two months. Not only did she place Plaintiff's finger in a splint and order x-rays, but she also regularly adjusted Plaintiff's medication to alleviate his pain. Furthermore, there is no evidence that she had any particular animosity toward Plaintiff; her statements regarding the severity of Plaintiff's injury are not enough. Based on the record, the Court finds that no reasonable jury could conclude that NP Stover's persistence in the use of the hand-made splint was so "extreme and outrageous" and went "beyond all possible bounds of decency." *See Diggs v. Ghosh*, 850 F.3d 905, 911 (7th Cir. 2017) (reversing dismissal of a deliberate indifference claim for delays in treatment of prisoner's knee injury but affirming dismissal of his claim for intentional infliction of emotional distress on that same ground because the medical providers had

provided some treatment, such as pain medication and physical therapy, and they did not threaten or harass prisoner).  Accordingly, NP is entitled to judgment as a matter of law as to Count 5.

Plaintiff also asserted the intentional infliction of emotional distress claim against Director of Nursing Lackey.  Plaintiff's deliberate indifference claim against Lackey was dismissed due to Plaintiff's failure to exhaust available administrative remedies prior to initiating this action.  In his Amended Complaint, Plaintiff alleged that on May 21, 2021, he spoke to Lackey while she was touring the Cellhouse Housing Units at Lawrence.  (Doc. 60, ¶22).  He informed Lackey of his finger injury and all the alleged inadequate medical treatment he had received thus far.  (*Id.*).  Lackey allegedly responded that "she would look into it."  (*Id.*).  Plaintiff further alleged that, while speaking to Director of Nursing Lackey about another matter on August 2, 2021, Plaintiff told her that it had been three months since he injured his finger, and the nurses continued to tell him there was not much they could do for his injury.  Lackey allegedly responded: "it's just a finger, they probably won't do much for it." (*Id.*).  Lackey denied those allegations.  (Doc. 64, pp. 3-4).  When asked about Nurse Lackey in his deposition, Plaintiff merely stated that he did not remember her exact job description, but he felt that she "could have interfered," and she could have provided a different course of treatment because she had "a little bit more knowledge than the other." (Doc. 99-2, pp. 55-56).  Even viewing the record in the light most favorable to Plaintiff, no reasonable jury could find that Lackey's conduct was so extreme and outrageous as to amount to intentional infliction of emotional distress.  Accordingly, Director of Nursing Lackey is entitled to summary judgment as a matter of law as to Count 5.

**Warden of Lawrence's  Motion to Dismiss for Lack of Jurisdiction (Doc. 110)**

Defendant, Jeremiah Brown, in his official capacity as the Warden of Lawrence, filed a motion to dismiss for lack of jurisdiction.  (Doc. 110).  The Warden of Lawrence was added as a

defendant in this case for the purpose of effectuating any necessary injunctive relief requested by Plaintiff. (Docs. 12 & 59). Because Plaintiff was thereafter transferred from Lawrence to Illinois River Correctional Center (Illinois River), the Warden of Lawrence argues that Plaintiff's request for injunctive relief against him should be dismissed as moot. Plaintiff did not file a response.

Rule 12(b)(1) permits the dismissal of any claim over which a federal court lacks subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Federal Rule of Civil Procedure 12(h)(3) mandates that "[i]f the court determines at *any* time that it lacks subject-matter jurisdiction, the court *must* dismiss the action." Fed. R. Civ. P. 12(h)(3) (emphasis added). Mootness strips a federal court of subject matter jurisdiction. *DJL Farm LLC v. EPA*, 813 F.3d 1048, 1050 (7th Cir. 2016) (per curiam), citing *Pakovich v. Verizon LTD Plan*, 653 F.3d 488, 492 (7th Cir. 2011). It is well-established that a prisoner's request for injunctive relief is rendered moot by his transfer to another prison unless the inmate "can demonstrate that he is likely to be retransferred." *Higgason v. Farley*, 83 F.3d 807, 812 (7th Cir. 1996) (citing *Moore v. Thieret*, 862 F.2d 148, 150 (7th Cir. 1988)); *Koger v. Bryan*, 523 F.3d 789, 804 (7th Cir. 2008).

Here, Plaintiff's claim for injunctive relief arises from constitutional deprivations that allegedly occurred at Lawrence. (Doc. 60). Plaintiff is no longer housed at Lawrence, but at Illinois River. (Doc. 101). As Plaintiff is no longer housed at Lawrence and has not filed any response demonstrating that he is likely to be retransferred, his claims for injunctive relief against the Warden of Lawrence are moot.

Further, the Court notes that while Plaintiff no longer seeks injunctive relief for his hand surgery, in his response to the motion for summary judgment, he asked that the Court grant him injunctive relief for the "ordered" occupational therapy. However, the Warden of Lawrence was added to this case because Plaintiff sought injunctive relief from staff at Lawrence. Plaintiff has

Page **24** of **25**

not responded to the motion to dismiss and has not indicated that the Illinois River Warden has also denied his request for occupational therapy. Accordingly, the Court finds that Plaintiff is not entitled to injunctive relief. The Warden of Lawrence's Motion to Dismiss for Lack of Jurisdiction (Doc. 110) is **GRANTED**, and Plaintiff's injunctive relief claim against the Warden of Lawrence is **DISMISSED without prejudice**.

**Conclusion**

For these reasons, Defendants Allison, Stover, Lackey, and Wexford's Motion for Summary Judgment (Doc. 99) is **GRANTED in part and DENIED in part,** and the Warden of Lawrence's Motion to Dismiss for Lack of Jurisdiction (Doc. 110) is **GRANTED**. The claim for injunctive relief against the Warden of Lawrence is **DISMISSED without prejudice as moot.** Counts 2, 3, 4, and 5 of the Amended Complaint are **DISMISSED with prejudice**. Count 1 is also **DISMISSED with prejudice** as to Defendants Donna Allison and Ashley Lackey, but not as to Defendant Sara Stover. The **Clerk of Court is DIRECTED to TERMINATE** the Warden of Lawrence, Donna Allison, Ashley Lackey, and Wexford Health Sources, Inc. as defendants.

**IT IS SO ORDERED.**

**DATED: August 11, 2025**

*s/ Reona J. Daly*
**Hon. Reona J. Daly**
**United States Magistrate Judge**